



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 28, 2020**

_Harlin DeWayne Hale_

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Bill Wayne Schwyhart and** | § | **Case No. 18-32288-hdh7** |
| **Carolyn Joyce Schwyhart,** | § | |
| | § | |
| | § | |
| Debtors. | § | |

---

| | | |
|---|---|---|
| **CHP, LLC** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 19-03005-hdh** |
| | § | |
| **Bill Wayne Schwyhart and** | § | |
| **Carolyn Joyce Schwyhart,** | § | |
| | § | |
| Defendants. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

On January 16, 2019, CHP, LLC ("CHP") filed the above-captioned adversary proceeding

against Bill Wayne Schwyhart ("Mr. Schwyhart") and Carolyn Joyce Schwyhart ("Mrs.

Schwyhart") (collectively, the "Debtors"). In the *Second Amended Complaint Objecting to Debtors' Discharge*[1] ( the "Complaint"), CHP seeks a global denial of the Debtors' discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), 727(a)(3), 727(a)(4)(A) and 727(a)(5). CHP alleges that (i) Mr. Schwyhart concealed property of the Debtors within one year prior to the petition date with the intent to hinder, delay, or defraud CHP; (ii) the Debtors concealed property of the estate after the petition date with the intent to hinder, delay, or defraud their creditors; (iii) the Debtors transferred property of the estate after the petition date with the intent to hinder, delay, or defraud their creditors; (iv) the Debtors failed to keep or preserve adequate financial records necessary for creditors to ascertain their financial condition; (v) the Debtors knowingly and fraudulently made false oaths or statements in connection with this bankruptcy case; and (vi) the Debtors failed to satisfactorily explain a loss or deficiency of assets to creditors.

Although the federal courthouse in Dallas was largely closed to the public due to the COVID-19 pandemic, at the parties' request, the Court conducted a live trial over three consecutive days beginning on June 22, 2020 and took the matter under advisement. The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.[2] For the reasons set forth in greater detail below, the Court finds and concludes that, in this case, the evidence does not support a denial of the Debtors' discharge.

## JURISDICTION AND VENUE

This Court has jurisdiction over the parties and the claims asserted in this proceeding under 28 U.S.C. § 1334. This adversary proceeding involves a core matter under 28 U.S.C.

---

[1] Docket No. 41.

[2] Any Finding of Fact more properly construed as a Conclusion of Law shall be considered as such, and *vice versa*.

2

§ 157(b)(2)(J), as it involves an objection to discharge. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

## PROCEDURAL HISTORY

On December 5, 2019 and December 6, 2019, CHP and the Debtors filed competing motions for summary judgment.[3] The Court held a hearing on the Summary Judgment Motions on January 24, 2020 and took the matters under advisement. On January 30, 2020, the Court issued its oral ruling on the Summary Judgment Motions (the "Summary Judgment Ruling"), which granted the Debtors' Motion for Summary Judgment as to CHP's claim under section 727(a)(5) and denied the Debtors' Motion for Summary Judgment in all other respects. The Court also denied CHP's Motion for Summary Judgment but ruled on certain facts in order to narrow the issues at trial pursuant to Federal Rule of Civil Procedure 56(g), made applicable in the bankruptcy context by Federal Rule of Bankruptcy Procedure 7056.[4]

In its Summary Judgment Ruling, the Court found that CHP established several elements of its surviving causes of action under section 727, including several elements on eight alleged false oaths. Critically, however, the Court determined that other important factual issues on CHP's claims remained. Specifically, many of CHP's claims required that CHP prove the Debtors acted with some sort of fraudulent intent.

A reviewing court should understand that a large part of the Complaint involves the Debtors' failure to disclose their interests in certain entities and bank accounts. In its Summary Judgment Ruling, the Court determined that the Debtors have an equitable interest in one of these

---

[3] *See Plaintiff's Motion for Partial Summary Judgment* [Docket No. 104] ("CHP's Motion for Summary Judgment"); *Defendant's Motion for Summary Judgment* [Docket No. 106] (the "Debtors' Motion for Summary Judgment").

[4] The Summary Judgment Ruling is incorporated by order. *See Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment* [Docket No. 138]; *see also Order on Plaintiff's Motion for Summary Judgment* [Docket No. 144].

entities' bank accounts. That ruling, however, came after the Debtors made alleged false statements and omissions, and the Debtors did not have the benefit of this Court's thinking when they prepared their bankruptcy documents.

In response to the COVID-19 pandemic, the United States Bankruptcy Court for the Northern District of Texas temporarily suspended all live, in-person hearings and this trial was postponed.[5] As previously mentioned, the parties subsequently requested that this Court hold a live (as opposed to video) trial so that the Court could better determine the credibility of the Debtors and witnesses. The Court agreed.

## I. <u>FINDINGS OF FACT</u>

### A. Background

1.  Mr. Schwyhart is an experienced and sophisticated businessman. He began his career in the early 1980s selling cars and later became the owner of several car dealerships in Arkansas. Mr. Schwyhart conducted his business with Robert Thornton ("<u>Thornton</u>"). The two later transitioned into real estate and had a successful real estate development career in Arkansas.

2.  In 1998, Mr. Schwyhart married Mrs. Schwyhart. Mr. Schwyhart has an adult son named Alex Schwyhart ("<u>Alex</u>") and Mrs. Schwyhart has an adult daughter named Kimberly Steerforth. Mrs. Schwyhart is trained as a bookkeeper and worked as a bookkeeper for many years.

3.  During the early 2000s, Mr. Schwyhart and Thornton became involved with J.B. Hunt ("<u>Hunt</u>") and Tim Graham ("<u>Graham</u>"). Together, these four individuals formed a jet leasing business. Following the sudden and unexpected death of Hunt in 2006, Hunt's widow, Johnelle Hunt, assumed control of Hunt's various business interests. Mr. Schwyhart's relationship with Johnelle Hunt was not like the one Mr. Schwyhart had with Hunt before he died. Johnelle Hunt

---

[5] *See General Order 2020-05*; *General Order 2020-08*; *General Order 2020-14*.

and Graham sought to separate their business interests from Mr. Schwyhart and Thornton. The parties eventually agreed on certain terms to go their separate ways.

4.      In 2008, the financial crisis hit. Hunt's death and the 2008 collapse proved too much for Mr. Schwyhart's highly leveraged businesses, and Mr. Schwyhart ended up with tens of millions of dollars in judgments against him.

5.      Some or many of these judgments were entered in favor of Mr. Schwyhart's former business partners or entities. Beginning in 2008, the Debtors and John Calamos ("Calamos") became engaged in litigation based upon Calamos' failure to perform under a contract related to the jet business (the "Calamos Litigation"). At some point before or during the Calamos Litigation, Calamos also acquired certain judgments against Mr. Schwyhart and Schwyhart Holdings, LLC ("Schwyhart Holdings"), (collectively, the "Calamos Judgments"). The Debtors and Calamos eventually entered into a confidential settlement agreement in 2013 (the "Calamos Settlement"), which included (i) releases, (ii) a transfer of the Calamos Judgments to Assero Holdings, LLC ("Assero"), and (iii) cash.

6.      In 2011, Johnelle Hunt and Graham formed Low Tide Holdings, LLC ("Low Tide"). Low Tide purchased the note secured by the Debtors' home located at 9 Clubhouse Drive, Rogers, Arkansas 72758 ("9 Clubhouse Drive") from Great Southern Bank. Low Tide then foreclosed on 9 Clubhouse Drive the same year and evicted the Debtors from their home.

7.      In September 2013, Johnelle Hunt and Graham also sued Mr. Schwyhart for the proceeds of the Calamos Litigation (the "Attachment Litigation") through various entities (the "Hunt/Graham Entities").[6] The Attachment Litigation was settled through a separate confidential

---

[6] The Hunt/Graham Entities include J.B. Hunt, LLC ("Hunt, LLC") and Big Horn Lodge Financing, LLC ("Big Horn"), among others.

settlement agreement (the "Attachment Settlement"), around the same time as the Calamos Settlement. The Attachment Settlement provided for the assignment of (i) judgments the Hunt/Graham Entities held against the Debtors (the "Hunt/Graham Judgments") and (ii) 9 Clubhouse Drive to Recipio Strategic Investments Fund I, LLC ("Recipio") or its assignee,[7] in exchange for funds from the Calamos Settlement.

8.     Around this time, various judgment creditors attempted to garnish the Debtors' personal bank accounts. These creditors were unsuccessful mainly because the Debtors historically paid all their expenses through corporate bank accounts for many years, including a bank account (the "HMG Account") in the name of HMG Investments, LLC ("HMG"), which the Debtors opened in 2013.

9.     Alex routinely placed funds into the HMG Account from his entity TWG Resources, LLC ("TWG"), which the Debtors used to fund their living expenses from 2013 to 2018.[8] Alex is involved in several other entities, including Pinnacle Expansion Point, LLC ("PEP") and Sterling Management Company, Inc. ("Sterling Management").

10.     The structure of HMG is somewhat complicated, like many entities operated by Mr. Schwyhart. HMG is a wholly owned subsidiary of South 40 Partners, LLC ("South 40"). South 40 is in turn owned by three entities, Thornhart Ventures, LLC ("Thornhart"), Robert B. Thornton, LLC ("Thornton, LLC"), and Schwyhart Holdings. Thornhart owns 99% of South 40, and the remaining 1% is split between Thornton, LLC (which owns 0.4%) and Schwyhart Holdings (which owns 0.6%). Thornton, LLC owns 40% of Thornhart and Schwyhart Holdings owns the other 60%.

---

[7] Recipio's assignee includes an entity named Pinnacle Villa, LLC ("Pinnacle Villa").

[8] Alex testified that he assisted the Debtors with their living expenses even prior to 2013—specifically, since 2011.

The Debtors own 100% of Schwyhart Holdings. Therefore, the Debtors indirectly control the majority of HMG.

11.    In May 2014, the Debtors moved back into 9 Clubhouse Drive, this time as caretakers for Pinnacle Villa—an entity that CHP alleges to be an *alter ego* of the Debtors.

12.    CHP is a limited liability company that was formed in October 2010 by Brian Ferguson ("Mr. Ferguson") and others to (i) manage foreclosed properties and assets held by banks and financial institutions and (ii) purchase judgments from banks and financial institutions. Before 2018, CHP had no business dealings with the Debtors. However, in February 2018, CHP purchased a judgment against Mr. Schwyhart from Regions Bank and began initiating collection efforts by filing a lawsuit in Arkansas state court[9] (the "State Court Suit").

13.    In March 2018, the Debtors moved out of Arkansas to Dallas, Texas for health reasons.

14.    The Debtors filed for relief under Chapter 7 of the Bankruptcy Code on July 6, 2018. Scott Seidel was appointed as the Chapter 7 Trustee.

15.    Several months after the Debtors' bankruptcy case was filed, Mr. Ferguson acquired another judgment against the Debtors through another one of his entities, Mudcat, LLC ("Mudcat"). Mr. Ferguson subsequently transferred Mudcat's claim to CHP.

16.    To date, creditors have filed claims exceeding $82 million in the Debtors' bankruptcy case. CHP is the only creditor who has objected to the Debtors' discharge.

### B.  Concealment of HMG and the HMG Account Pre-Petition

17.    CHP deposed Mr. Schwyhart in the State Court Suit on May 16, 2018 (the "State Court Deposition"), less than two months before the Debtors filed their bankruptcy petition.

---

[9] Case No. 04cv-18-1541 in the Benton County Arkansas Circuit Court.

18.     Mr. Schwyhart made several statements under oath during the State Court Deposition. Importantly, Mr. Schwyhart generally testified that he believed his wife, Mrs. Schwyhart, owned 100% of HMG.  Mr. Schwyhart further stated that he did not know if HMG had a bank account. These statements concealed Mr. Schwyhart's interest in HMG and the HMG Account.

19.     Mr. Schwyhart opened the HMG Account and was an authorized signer. He opened the HMG Account around the same time as several creditors were attempting to garnish the Debtors' personal bank accounts. The Debtors paid their personal expenses through the HMG Account. Mr. Schwyhart placed HMG back in good standing around this time in October 2013. CHP argues that together, these facts show that Mr. Schwyhart intended to hide HMG and the HMG Account from CHP and other creditors.

20.     At trial, however, Mr. Schwyhart credibly testified before this Court as to several reasons why his State Court Deposition statements were not intended to conceal his property from creditors. Mr. Schwyhart testified that he was not expecting to be asked about HMG and did not review any records regarding HMG before the State Court Deposition. Mr. Schwyhart stated that he *believed* his wife owned HMG. The Debtors have been involved in "over 100 LLCs" and since Mrs. Schwyhart handled the finances of HMG, Mr. Schwyhart thought she owned it. This is bolstered by the fact that Mrs. Schwyhart wrote all the checks on the HMG Account.

21.     With respect to Mr. Schwyhart's statement that he did not know whether HMG had a bank account, the Court also finds Mr. Schwyhart gave a credible explanation. Mr. Schwyhart testified that the Debtors discussed closing the HMG Account during the time they were moving to Texas. There is no dispute that Mr. Schwyhart knew the HMG Account existed at one time. He just did not know whether it existed *at that time*.

### C. False Oaths[10]

22.     CHP alleges that the Debtors made many false oaths and accounts based on what the Debtors disclosed or omitted from their bankruptcy schedules (the "Schedules"),[11] their Statement of Financial Affairs (the "SOFA"), their Statement of Intention for Individuals Filing under Chapter 7 (the "Statement of Intent"),[12] as well as statements made during their August 14, 2018 section 341 meeting (the "341 Meeting") and the December 17, 2018 Federal Rule of Bankruptcy Procedure 2004 examination (the "2004 Exam") with the United States Trustee (the "U.S. Trustee").[13]

23.     All the statements the Debtors made on their Schedules, SOFA, Statement of Intent, at the 341 Meeting, and during the 2004 Exam were under oath.

####        i.        False Oaths Related to HMG

24.     **Scheduling $490,000 in Debt to HMG.** The Debtors listed HMG as an unsecured creditor owed $490,000 on their Schedules (the "HMG Debt"). Mr. Schwyhart testified that he did not know if he had a loan agreement with HMG and he did not provide one to the U.S. Trustee or to CHP. In addition to the lack of a loan agreement, CHP relies on Mr. Schwyhart's 2004 Exam statement that the HMG Debt "relates to draws and distributions that . . . I've had taken out of that entity over the years of its existence" as evidence that the funds were in fact equity distributions instead of loans.

---

[10] CHP raised numerous allegations of false oaths under section 727(a)(4)(A) in its Complaint. Any allegations of false oaths the Court has omitted from its Findings of Fact and Conclusions of Law were not raised by CHP at trial or supported with sufficient evidence. Accordingly, CHP has failed to meet its burden on these issues.

[11] The Schedules include the Debtors' original schedules filed on July 20, 2018, and an amended version of schedule C filed on August 7, 2018. *See* Docket Nos. 15, 24.

[12] The SOFA and Statement of Intent were also filed on July 20, 2018.

[13] Because the parties did not complete the 341 Meeting on August 14, 2018, the continued 341 Meeting was held simultaneously with the 2004 Exam.

25.     Based on the evidence and the testimony at trial, CHP has failed to prove that the HMG Debt is not a loan and that the Debtors' statement is false. Mr. Schwyhart credibly testified that he understood "draws and distributions" and "loans" to be "one in the same" because a person can make a draw or a distribution from a loan.  He stated that he "would not compromise [his] integrity over the Schedules . . . by trying to get a piece of what [he] didn't think would be anything."

26.     In addition, the Debtors credibly testified that they provided all documents in their possession showing their relationship to HMG to the U.S. Trustee. The Debtors' answers to questions posed during the 2004 Exam are consistent with their testimony at trial and consistent with their position on the Schedules. Even assuming, *arguendo*, that the Debtors' statement about the HMG Debt is false, it appears to be the Debtors' honest belief that the money they took out of the HMG Account were loans they intended to pay back.[14] CHP has not proven the Debtors listed the HMG Debt knowingly or with fraudulent intent.

27.     **Failure to Disclose HMG on Schedules and SOFA.** The Debtors failed to list HMG as an entity they controlled or had an equitable interest in on their SOFA and Schedules. Part 11 of the SOFA requires debtors to list businesses they own or businesses with which debtors have certain "connections." The Debtors did not list HMG and did not subsequently amend their SOFA. Similarly, Schedule A/B did not mention any ownership interest, equitable or otherwise, in HMG in either Part 4, item 19 or Part 5, item 42.

28.     The Debtors have complete control of HMG, a managerial relationship with HMG, and use of the HMG Account for personal expenditures. Mr. Schwyhart signed HMG's operating agreement as manager and member. Mrs. Schwyhart wrote all the checks on the HMG Account.

---

[14] The Debtors similarly scheduled $189,000 of debt to Schwyhart Holdings and $6,000 to Thornhart. The only testimony introduced into evidence at trial was from the 2004 Exam where Mr. Schwyhart testified that these were borrowed funds. Accordingly, CHP has not met its burden in showing the Debtors did not properly schedule these debts as loans, or that the Debtors acted with fraudulent intent.

Because the Court finds the Debtors have an equitable interest in HMG, the Debtors' failure to disclose HMG on their Schedules and SOFA were false statements.

29.     But based on the credible testimony of the Debtors and the Debtors' bankruptcy counsel ("Mr. Moore"), the Court finds that the Debtors' failure to disclose HMG on their Schedules and SOFA was not done with fraudulent intent. These interests should have been disclosed, but the Debtors and Mr. Moore honestly believed disclosure was not necessary. The Court had not ruled on whether the Debtors had an equitable interest in the HMG Account at the time the Debtors' prepared the Schedules and SOFA, so the Debtors' did not have the benefit of that ruling. Accordingly, the Court believes that the Debtors (i) did not know they had to disclose HMG and (ii) did not intend to defraud creditors when they failed to do so.[15]

30.     **Failure to Disclose the HMG Account.** The Court held in its Summary Judgment Ruling that the Debtors have an equitable interest in the HMG Account. Accordingly, the Debtors' failure to disclose the HMG Account on their Schedules was false, but the Court left open the issue as to whether the Debtors' failure to do so was knowingly and with fraudulent intent so that the Court could assess the Debtors' credibility at trial.

31.     CHP argues the Debtors failed to disclose the HMG Account in order to hide it from their creditors. In support, CHP relies on the fact that Mr. Schwyhart opened the HMG Account shortly before the Debtors received two writs of garnishment from creditors, and Mr. Schwyhart put HMG back in good standing with the Arkansas Secretary of State around the same time.

---

[15] The Complaint also lists the Debtors' failure to disclose Thornhart and South 40 as false oaths. No testimony or additional evidence was introduced about either of these entities at trial. Accordingly, CHP has failed to meet its burden on these omissions. Notably, the Debtors' do not seem evasive in their answers to questions about Thornhart and South 40 during the 2004 Exam, and the Debtors turned over documents related to these two entities to the U.S. Trustee.

32.     At trial, Mr. Schwyhart credibly testified that the Debtors had been using various corporate accounts to pay for personal expenses since before 1998, on the advice of the Debtors' accounting firm. Mr. Schwyhart also explained that there was another HMG bank account that existed prior to the issuance of the writs of garnishment, and that he had no intent to avoid garnishment when he set up the HMG Account.

33.     It appears to this Court that the Debtors held an honest belief that they did not own the funds in the HMG Account and did not have to disclose the HMG Account on their Schedules prior to the Summary Judgment Ruling. Even though the Debtors used the HMG Account to pay for personal expenses pre-petition, the Debtors' believed the money from the HMG Account was HMG's and not theirs. The Debtors' pattern of behavior is consistent with this belief. And the Debtors' testimony at trial was credible.

34.     **Transfer of $16,000 out of the HMG Account.** The Debtors transferred approximately $16,000 out of the HMG Account after the petition date. The Debtors did not disclose this transfer on their Schedules or SOFA. CHP argues that these transfers were evidence of the Debtors' fraudulent intent to hide HMG and assets from creditors.

35.     As the Court previously discussed, the Debtors mistakenly believed that any money from the HMG Account belonged to HMG and not the Debtors. Mrs. Schwyhart testified that she would not have made any payments from the HMG Account had she known it was subject to the Court's jurisdiction. Mrs. Schwyhart's testimony was credible and not indicative of someone operating with an intent to defraud creditors.

36.     **TWG's Regular Payments to HMG**. The Debtors failed to list TWG's regular payments to HMG (the "TWG Income") on Schedule I. Specifically, line 11 of Part 2 requires debtors to "[s]tate all other regular contributions to" their expenses, and to include contributions from

relatives. It is undisputed that Alex, through TWG, (i) regularly sent payments to HMG, (ii) the Debtors were aware of these payments, and (iii) the Debtors used these funds to pay for their personal living expenses. Accordingly, the Debtors' failure to list the TWG Income was a false statement.

37.     Alex credibly testified that he considered the TWG Income as loans because he was "expected to be paid back." In fact, Alex stated that he periodically received repayments through TWG from HMG and that he continued to extend funds to HMG as a "revolving credit facility." In addition, Mr. Schwyhart credibly testified that he used some of the TWG Income for business expenditures—namely, to help him relaunch his career in commercial real estate. In the 2004 Exam, Mr. Schwyhart testified he was meeting his monthly expenses through what he assumed were "gifts" from Alex, and that he previously took loans from HMG.

38.     Taken together, the Court finds that the Debtors did not act with fraudulent intent when they failed to disclose the TWG Income. It is reasonable to believe that Mr. Schwyhart may not view a loan as income and that HMG was receiving loans from TWG. And if the Debtors were attempting to conceal the TWG Income, they would not have disclosed the HMG Debt and the gifts they received from Alex during the 341 Meeting and 2004 Exam.

39.     **American Express.** HMG has an American Express business gold card (the "Amex Card") and Mrs. Schwyhart is jointly and severally liable on the Amex Card according to its cardmember agreement. In its Summary Judgment Ruling, the Court held that the Debtors' failure to list American Express as a creditor on the Schedules and failure to disclose $18,777.97 in payments to American Express within 90 days prior to the petition date on the SOFA were false statements.

40.     At trial, Mrs. Schwyhart explained that she filled out the American Express application for the HMG Account in 2014. When asked whether she believed she was personally liable on the

HMG Account, Mrs. Schwyhart credibly testified "no." She explained that the Amex Card never showed up on her pre-petition credit reports. She made no attempt to conceal the Amex Card's existence during the 341 Meeting and the 2004 Exam. Mrs. Schwyhart even omitted certain Amex Card payments she made for her grandchildren's braces from the SOFA because she honestly believed she was not liable on the Amex Card.

41.     **Failure to Disclose Attorney's Fees on the SOFA.** In the Summary Judgment Ruling, the Court held that the Debtors' failure to disclose the source of their attorney's fees was a false statement. The Debtors paid Mr. Moore with funds from the HMG Account. Because this allegation was barely addressed at trial, CHP failed to prove that the Debtors' omission was done with an intent to defraud creditors.

42.     **Failure to List HMG as a Co-Debtor.** The Court found in its Summary Judgment Ruling that the Debtors' failure to list HMG as a co-debtor on some of the Debtors' judgments in their Schedules were false statements. But again, CHP did not address this issue at trial sufficient to show the Debtors acted with fraudulent intent.

43.     **Statements at the 341 Meeting and 2004 Exam about HMG and the HMG Account**. CHP alleges that the Debtors made various false oaths at the 341 Meeting and the 2004 Exam. Specifically, Mr. Schwyhart generally stated that (i) he did not know who owned HMG and (ii) he was not the signer on the HMG Account.

44.     Mr. Schwyhart testified during the 341 Meeting that he knew HMG was owned by other LLCs, but he did not know which one. HMG does not have a simple organizational structure. And Mr. Schwyhart testified that he was involved in over 100 LLCs. It appears to the Court that Mr. Schwyhart had a genuine lack of knowledge as to the exact organizational structure of HMG. Thus,

CHP has failed to meet its burden in proving Mr. Schwyhart's statement was false, that he knew it was false, or that he made it with fraudulent intent.

45.     Conversely, Mr. Schwyhart's statement that he was not a signer on the HMG Account was false. Mr. Schwyhart was a signer on the HMG Account, and he opened the HMG Account.  Mr. Schwyhart's credible testimony and the evidence admitted at trial, however, demonstrate that he did not make this false statement knowingly or with fraudulent intent. Only Mrs. Schwyhart signed checks from the HMG Account. Additional 341 Meeting testimony shows that Mr. Schwyhart was unaware he could sign checks on the HMG Account. At trial, Mr. Schwyhart explained that he "didn't think [he] had the authority, didn't ask for the authority." Mr. Schwyhart's testimony on this point was credible.

46.     **Failure to Disclose Adam Mostyn Trust Loan Repayment.** Bank records at trial show that the Debtors repaid $15,000 they loaned from the Adam Mostyn Trust with funds from the HMG Account within one year of the petition date. The Debtors did not disclose this pre-petition transfer on their SOFA, and the Debtors' omission was a false statement.

47.     The Court finds the Debtors honestly believed they did not have an equitable interest in the HMG Account at the time they completed their SOFA and Schedules. Accordingly, the Debtors were unaware that the HMG Account should have been disclosed, until the Court later ruled disclosure was necessary in its Summary Judgment Ruling. CHP has not met its burden in showing the Debtors' omission was done with fraudulent intent.

        ii.     False Oaths Related to Sterling Management

48.     **341 Meeting.** In its Summary Judgment Ruling, the Court found that Mr. Schwyhart's statement that Sterling Management had "nothing to do…with [him]" was false.  At trial, Mr. Schwyhart explained that his understanding of the Chapter 7 Trustee's question at the 341 Meeting

15

was that he did not directly or indirectly own Sterling Management. Mr. Schwyhart's explanation was credible. Accordingly, Mr. Schwyhart did not act with fraudulent intent when he made this statement.

49.     **2004 Exam**. At the 2004 Exam, Mr. Schwyhart testified that he "[was] not familiar with the organization of [Sterling Management]." CHP argues that Mr. Schwyhart knew this statement was false because (1) Mr. Schwyhart recently acknowledged that his children beneficially owned Sterling Management and (2) Mr. Schwyhart sent an email regarding a Sterling Management loan (the "Sterling Management Loan").

50.     At trial, it was apparent to the Court that Mr. Schwyhart was not familiar with Sterling Management's organization. Mr. Schwyhart looked at Sterling Management's certificate of bylaws and seemed to express surprise that the company was in fact owned by PEP. Alex became the sole owner of PEP sometime between 2011 and 2013. Mr. Schwyhart credibly testified that did not know that PEP was involved.

51.     In addition, Mr. Schwyhart examined his email and several other pieces of evidence from Chambers Bank regarding the Sterling Management Loan. He credibly testified that he did not recall signing certain documents and had not seen some of them before. He also explained that he was asked to pledge money from the Calamos Litigation and the extent of his involvement with the Sterling Management Loan was that pledge. Taken together, this evidence does not show Mr. Schwyhart's statement about Sterling Management's organization was false.

      iii.    False Oaths in Listing Judgment Creditors

52.     CHP alleges the Debtors made false oaths on their Schedules by failing to disclose or by improperly disclosing certain judgment creditors. Specifically, CHP alleges that the Debtors failed

to disclose Assero, Recipio, and Purgo Capital, LLC ("Purgo").[16] CHP also alleges the Debtors improperly disclosed Calamos; Hunt, LLC; and Big Horn.

53.     The Calamos Settlement included an assignment of the Calamos Judgments to Assero. Likewise, the Attachment Settlement provided for an assignment of the Hunt/Graham Judgments to Recipio. Critically, however, CHP did not present any evidence to show these assignments were made or recorded pursuant to the two settlement agreements.

54.     Mr. Schwyhart testified that he understood the Calamos Settlement to release claims against the Debtors related to certain specific disputes. Mr. Schwyhart testified that based on his research of recorded judgments in Arkansas, (i) Calamos never actually transferred the Calamos Judgments to Assero pursuant to the Calamos Settlement and (ii) Hunt, LLC and Big Horn never transferred the Hunt/Graham Judgments to Recipio. Mr. Schwyhart also testified that the Debtors disclosed Calamos because he believed Calamos still held the Calamos Judgments. Likewise, Mr. Schwyhart believed that Hunt, LLC and Big Horn still held the Hunt/Graham Judgments. Mr. Moore testified that he independently researched recorded judgments against the Debtors, and he counseled the Debtors in disclosing these judgments.

55.     Ultimately, the Court cannot find the Debtors' disclosures were false oaths based on the witnesses' credible testimony. The Calamos Settlement and the Attachment Settlement both provided for assignments of the Calamos Judgments and Hunt/Graham Judgments to Assero and Recipio, respectively. But CHP did not present any evidence to show that these transfers were made. Even if the Debtors' statements were false, however, the Court finds a lack of fraudulent intent.

---

[16] In its Complaint, CHP alleges that the Debtors failed to disclose Purgo as a creditor. This allegation was not addressed at trial or supported with sufficient evidence. Accordingly, CHP has failed to meet its burden on this issue.

      iv.    <u>Remaining False Oaths</u>

56.    **Failure to Disclose Mrs. Schwyhart as a Trustee of Two Trusts**. Mrs. Schwyhart's prior statements, testimony at trial, and other evidence establish that Mrs. Schwyhart was the trustee of the Adam Mostyn Trust and the Lynda Mostyn Grandchildren Trust (collectively, the "<u>Trusts</u>") at the time of the Debtors' bankruptcy filing. The Debtors did not disclose the Trusts on their SOFA and the Debtors' omission constitutes a false statement.

57.    Mrs. Schwyhart controls the Trusts for the benefit of third parties. The Debtors are not directly or indirectly beneficiaries of the Trusts. Mrs. Schwyhart credibly testified that "the money is not mine, I never considered it mine that I needed to list it." Mr. Moore also testified that he did not recommend that the Debtors amend their Schedules to include this disclosure, as it would yield to "form over substance." While the Court disagrees with Mr. Moore's assessment, the Court finds that the Debtors' omission of the Trusts is not material. In addition, the Court finds the Debtors lacked fraudulent intent in making this omission.

58.    **Failure to Disclose Payments for Grandchildren's Orthodontic Work.** Through its Complaint, CHP alleges that the Debtors made a false oath when they only disclosed a $2,765 payment for their grandchild's braces on their SOFA (the "<u>Braces Disclosure</u>"). At trial, CHP also alleged that Mrs. Schwyhart failed to disclose just over $6,000 the Debtors paid from the HMG Account for two grandchildren's orthodontic work in the two years before the Debtors' bankruptcy filing (the "<u>Braces Omission</u>").[17] The Debtors' failure to disclose the Braces Omission was false.[18]

---

[17] Importantly, the Debtors' failure to disclose the Braces Omission does not specifically appear in the Complaint. Because CHP spent a substantial amount of time on this issue at trial, the Court will address it anyway.

[18] Since the Court later determined in its Summary Judgment Ruling that the Debtors have an equitable interest in the HMG Account, the Braces Disclosure does not constitute a false statement. Regardless, the manner in which the Debtors treated the Braces Disclosure and Braces Omission in the SOFA is consistent with the Debtors' erroneous but sincere beliefs about their relationship with HMG.

59.    Mrs. Schwyhart provided credible explanations that show a lack of fraudulent intent as to the Braces Omission. At trial, Mrs. Schwyhart first explained that she listed the Braces Disclosure because she paid for it using her personal credit card, which she knew she was personally liable on. Subsequently, this bill was paid with funds from the HMG Account. Mrs. Schwyhart next explained that she did not disclose the Braces Omission because that bill was paid directly from the HMG Account using the Amex Card. At that time, Mrs. Schwyhart erroneously but honestly believed she did not have to disclose direct payments from the HMG Account.

60.    **The Debtors' Citibank Card**. The Debtors disclosed a debt to Citibank on Schedule E/F but failed to check the box disclosing who was liable for the debt. At the 341 Meeting, Mrs. Schwyhart testified that all the Debtors' credit cards were hers. However, Mr. Schwyhart opened the line of credit with Citibank in 1995 and was personally liable on the account. Mrs. Schwyhart was an authorized user. Therefore, the Debtors' omissions on Schedule E/F and Mrs. Schwyhart's statements were false.

61.    However, the Court does not believe the Debtors' statements were done with fraudulent intent. Credible testimony at trial established that for most of the time, the Debtors only had one physical card (the "Citibank Card"). The Citibank Card was in Mrs. Schwyhart's possession and had her name on it. Mrs. Schwyhart paid the Citibank bills, and if Mr. Schwyhart ever wanted to use the Citibank Card, he testified that he would ask her.

62.    **Mr. Schwyhart's Statement Regarding Pinnacle Villa**. At the 341 Meeting, Mr. Schwyhart testified that Pinnacle Villa has "nothing to do with [him] or [his] family members." Business records demonstrate that Alex was paying for attorney matters related to Pinnacle Villa. Therefore, Mr. Schwyhart's statement was false.

63.     However, CHP has not proven that Mr. Schwyhart knew the statement was false or that he acted with fraudulent intent. The Attachment Settlement ultimately assigned 9 Clubhouse Drive to Pinnacle Villa. Mr. Schwyhart admitted that 9 Clubhouse Drive was owned by "some third-party LLC." There is little, if any, evidence to show that Mr. Schwyhart personally knew the extent of his son's involvement in Pinnacle Villa. Rather, it appears Mr. Schwyhart made this statement in response to the Chapter 7 Trustee's questions about Pinnacle Villa's ownership. Accordingly, the Court finds a lack of fraudulent intent.

64.     **Mrs. Schwyhart's Wells Fargo/Dillard's Card**. Mrs. Schwyhart has a personal credit card with Wells Fargo/Dillard's. On the petition date, Mrs. Schwyhart owed Wells Fargo/ Dillard's $3,450 in unsecured debt (the "Wells Fargo/Dillard's Debt"). The Debtors did not disclose the Wells Fargo/Dillard's Debt on the Schedules. This omission was a false statement.

65.     At trial, Mrs. Schwyhart testified that she wrote a check from the HMG Account on the petition date to pay the Wells Fargo/Dillard's Debt. She explained that she did not disclose the Wells Fargo/Dillard's Debt because she did not believe she owed Wells Fargo/Dillard's anything at the time the Debtors completed their Schedules.[19] Mrs. Schwyhart's explanation—despite her erroneous belief—was credible.

### D. Concealment of HMG and the HMG Account Post-Petition

66.     CHP generally alleges that the Debtors' false statements as to HMG and the HMG Account on their Schedules and SOFA[20] as well as statements the Debtors made with respect to HMG at

---

[19] Mrs. Schwyhart also paid Wells Fargo/Dillard's $100 on July 9, 2018—three days after the petition date. But the evidence suggests Wells Fargo/Dillard's regularly withdrew $100 from the HMG Account around this time each month. Ultimately, the Court does not believe this payment was made with an intent to defraud creditors.

[20] Through its Complaint, CHP also alleges the Debtors' concealed their interests in South 40 and Thornhart. However, CHP dropped these arguments at trial.

the 2004 Exam and 341 Meeting constitutes concealment of the Debtors' property within the meaning of section 727(a)(2)(B).

67.     The Debtors' interests in HMG and the HMG Account should have been disclosed. But the Debtors' testimony and the evidence demonstrate that the Debtors erroneously but sincerely believed they did not own HMG, and that the money the Debtors received from the HMG Account was a loan. The Debtors' testimony that they both relied on the advice of counsel in failing to disclose HMG and the HMG Account was credible.

### E. Transfer of Assets Post-Petition

68.     The Debtors transferred approximately $16,000 out of the HMG Account after the petition date. In its Summary Judgment Ruling, the Court held the Debtors have an equitable interest in the HMG Account. Accordingly, the HMG Account is property of the estate. Because the Court previously found Mrs. Schwyhart's testimony was credible as to this transfer, CHP has failed to satisfy its burden on this claim.[21]

### F. Sufficiency of Financial Records for HMG[22]

69.     CHP alleges that the Debtors' have failed to maintain adequate financial records for HMG within the meaning of section 727(a)(3). Specifically, CHP argues that (i) the Debtors' records for HMG are scant and (ii) the Debtors did not produce a formal loan agreement with HMG.

70.     Mr. Schwyhart testified at trial that the Debtors provided 1,500 to 2,000 pages of documents to the U.S. Trustee, the Chapter 7 Trustee, and CHP. These documents include bank records as well as some checks, credit card statements, and deposit information for HMG. Mr.

---

[21] *See* ¶¶ 34, 35.

[22] The Complaint also alleges that the Debtors failed to adequately maintain records under section 727(a)(3) for Schwyhart Holdings, Recipio, and the Adam Mostyn Trust. CHP announced it was no longer pursuing these allegations at trial.

Schwyhart also testified that the Debtors produced all the documents they had regarding HMG, and that he did not know whether he had formal loan agreement with HMG but that he was not in possession of one. The Court finds that Mr. Schwyhart's testimony was credible.

## II.    CONCLUSIONS OF LAW

71.    Courts must construe objections to discharge liberally in favor of the debtor and strictly against the objecting party. *See Cadle Co. v. Preston-Guenter (In re Guenther)*, 333 B.R. 759, 763 (Bankr. N.D. Tex. 2005). A discharge is a privilege not a right. *Id.* But a court should grant debtors a discharge when they put a good faith effort to produce the entire picture of their financial affairs. *Id.*

72.    The objecting party must prove that the denial of a debtor's discharge is warranted by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991); *see also Beaubouef v. Beaubouef (In re Beaubouf)*, 966 F.2d 174, 178 (5th Cir. 1992). The burden is a "shifting" burden and the movant must initially make out a *prima facie* case that grounds for denial of discharge under section 727 exist. *Buckeye Retirement Co., LLC v. Bullough (In re Bullough)*, 358 B.R. 261, 281 (Bankr. N.D. Tex. 2007). The burden next shifts to the debtor to satisfactorily explain why a discharge should be granted. *Id.*

### A. The Debtors did not Transfer or Conceal Property with Intent to Defraud Creditors

73.    CHP alleges three causes of action under section 727(a)(2) in its Complaint—one against Mr. Schwyhart (Count I) and two against the Debtors (Counts II and III). Section 727(a)(2) of the Bankruptcy Code provides that the Court shall grant a debtor a discharge unless,

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed–
> (A) property of the debtor, within one year before the date of the filing of the petition; or
> (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).

74.    To prevail on its claim under section 727(a)(2)(A), CHP must prove that Mr. Schwyhart

(1) transferred or concealed property; (2) belonging to the debtor; (3) within one year of the filing

of the petition; and (4) with intent to hinder, delay, or defraud a creditor or officer of the estate.

*Guenther*, 333 B.R. at 764 (citing *Cadle Company v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th

Cir. 2005)). To prevail on its claim under section 727(a)(2)(B), CHP must generally prove these

same elements against the Debtors, except that the property must be property of the estate and the

transfer or concealment must occur post-petition. *See* 11 U.S.C. § 727(a)(2)(B).

75.    **CHP Failed to Prove the Debtors had Fraudulent Intent.** CHP must prove the Debtors

had an actual intent to defraud creditors; constructive intent is insufficient. *Robertson v. Dennis*

*(In re Dennis)*, 330 F.3d 696, 701 (5th Cir. 2003). Actual intent may be shown by circumstantial

evidence. *Id* at 702-03.

76.    As the Court previously discussed, CHP introduced some circumstantial evidence in

support of its claims under Counts I, II, and III.  Mr. Schwyhart placed HMG back in good standing

and opened the HMG Account in 2013. Around this time, several creditors were attempting to

garnish the Debtors' personal bank accounts. The Debtors used the HMG Account to pay for

personal expenses. And the Debtors transferred funds out of the HMG Account after the petition

date.

77.    Importantly, however, the Debtors' testimony at trial was credible. Mr. Schwyhart testified

that at the time his statements were made, he believed his wife owned 100% of HMG. He credibly

testified that he was unsure if Mrs. Schwyhart had closed the HMG Account, which is why during

the State Court Deposition he stated he did not know whether HMG had a bank account. Given

Mr. Schwyhart's credible testimony, CHP has failed to meet its burden in proving that Mr. Schwyhart intended to conceal the HMG Account pre-petition to defraud CHP and other creditors.

78.     As to the Debtors' post-petition transfers, the Court concludes the Debtors had an honest but erroneous belief that they lacked an equitable interest in HMG and the HMG Account. The Debtors' belief that they did not have to disclose HMG or could not use the HMG Account up until the Court issued its Summary Judgment Ruling further demonstrates the Debtors' lack of intent. Accordingly, CHP has failed to satisfy its burden showing the Debtors' fraudulent intent on this claim.

79.     Because CHP has failed to meet its burden on the element of fraudulent intent, its claims under sections 727(a)(2)(A) and (B) fail.

**B. The Debtors Maintained Sufficient Financial Records**

80.     Under section 727(a)(3), the court shall deny a debtor his discharge when "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information . . . from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). The purpose of this section is to allow creditors to examine a debtor's financial condition and determine what has passed through a debtor's hands. *Guenther*, 333 B.R. at 765. A debtor's financial records need not contain "full detail," but "there should be written evidence of the debtor's financial condition." *Judgment Factors, L.L.C. v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016).

81.     The creditor bears the initial burden to show the debtor has concealed or failed to adequately maintain records and that this failure prevented the creditor from ascertaining the debtor's financial condition, and the burden next shifts to the debtor to prove that any inadequacy

"is justified based on the totality of circumstances including what a reasonable person would do in similar circumstances." *Guenther*, 333 B.R. at 765.

82.     Sophisticated debtors are held to a higher standard when it comes to the disclosure of records. *See Bullough*, 358 B.R. at 284. A debtor is required to disclose ownership interests in different legal entities but need not disclose their assets or transactions. *Packer*, 816 F.3d at 94. A court "has wide discretion in determining whether a debtor has produced sufficient records." *Bullough*, 358 B.R. at 283.

83.     The Court concludes that the Debtors have satisfied their burden under section 727(a)(3) under the standard in this Circuit. While a formal loan agreement between the Debtors and HMG would certainly be helpful, the Debtors did produce bank records, as well as some checks, credit card statements, and deposit information for HMG. These records, coupled with Mr. Schwyhart's explanations, are sufficient for CHP to ascertain the Debtor's financial condition and business transactions under section 727(a)(3).

### C.  The Debtors did not Make False Oaths

84.     The Court will deny a debtor's discharge under section 727(a)(4)(A) if the debtor knowingly and fraudulently makes a false oath or account in connection with the bankruptcy case. A showing of a "false oath" requires CHP to prove, by a preponderance of the evidence, (1) the Debtors made a statement under oath; (2) the statement was false; (3) the Debtors knew the statement was false; (4) the Debtors made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *See Pratt*, 411 F.3d at 566. Even if the Debtors had no actual intent to defraud, fraudulent intent may be established "through the cumulative effect of a large number of falsehoods in a debtor's schedules as evidence of a reckless disregard for the truth." *Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 367 (Bankr. N.D. Tex. 2010).

85. **The Debtors' Statements Were Under Oath.** False oaths include (i) false statements or omissions in a debtor's schedules or statement of financial affairs and (ii) false statements the debtor makes at an examination during the bankruptcy proceeding. *Bullough*, 358 B.R. at 281 (citing *Beaubouef*, 966 F.2d at 178). The Debtors' statements in this case were made under oath.

86. **The Debtors Made Some False Statements.** An omission of information requested in a debtor's schedules or statement of financial affairs is an affirmatively false statement that the undisclosed information did not exist. *Gebhardt v. Gartner (In re Gartner)*, 326 B.R. 357, 367 (Bankr. S.D. Tex. 2005). The Debtors made several omissions in their Schedules and SOFA, and some false statements during the 341 Meeting. In addition to the statements the Court addressed in its Summary Judgment Ruling, the Debtors failed to disclose (i) their equitable interest in HMG, (ii) the $16,000 transfer from the HMG Account, (iii) the TWG Income, (iv) the Adam Trust Loan Repayment, (v) the Braces Omission, (vi) American Express, (vii) the Trusts, (viii) the Citibank Card, and (ix) the Wells Fargo/Dillard's Debt. However, most of these omissions or any additional false statements relate to HMG or were paid by the Debtors using funds from the HMG Account, which the Debtors wrongly but honestly believed did not need to be disclosed.

87. CHP failed to meet its burden in showing other statements and disclosures were false. For example, CHP did not meet its burden in showing the Debtors' disclosure of the HMG Debt was improper. And CHP did not show that the Debtors' disclosure of Calamos; Hunt, LLC; and Big Horn as judgment creditors, and omission of Assero; Recipio; and Purgo as judgment creditors were false.

88. **Most of the Debtors' Statements Were Material.** A false oath is material within the meaning of section 727(a)(4)(A) "if it relates to the debtor's business transactions or concerns the discovery of assets or business dealings." *Gebhardt*, 326 B.R. at 372. Bank accounts and business

interests are material. *See Guenther*, 333 B.R. at 768. Lack of value of an asset is no defense. *See Bullough*, 358 B.R. at 282. However, a debtor's failure to list that he or she is a trustee of a trust is not material. *See Pratt*, 411 F.3d at 568.

89.     In addition to the eight statements addressed by the Court in its Summary Judgment Ruling, nearly all of the Debtors' statements and omissions in the Complaint are material. But the Debtors' failure to disclose Mrs. Schwyhart as the trustee of the Trusts is not material.

90.     **Circumstances Show Some Knowledge of Falsity.** A creditor can show knowledge of falsity by circumstantial evidence, or by direct evidence where the debtors had knowledge of their current and former business affairs. *Crumley*, 428 B.R. at 366. The moving party "need not prove that the debtor consciously chose to omit or misstate information, only that the debtor knew the truth when the omission or misstatement was made." *Cadle Co. v. Mitchell (In re Mitchell)*, 102 Fed. Appx. 860, 862 n.1 (5th Cir. 2004).

91.     For most of the false oath allegations raised in the Complaint, CHP did not meet its burden in proving the Debtors' had knowledge their statements were false. Nevertheless, circumstances show that some of the Debtors' statements related to HMG and the HMG Account may have been knowingly false. While Mr. Schwyhart may not have known he was the signer of the HMG Account, the Debtors knew about their involvement with HMG, used the HMG Account for personal expenses, and continued to use the HMG Account post-petition. The Debtors knew of the existence of these assets; however, the Debtors (i) did not believe they needed to be disclosed and (ii) honestly believed their omission of these assets was proper.

92.     **CHP Failed to Prove an Intent to Deceive.** CHP must prove that the Debtors' false statements were made with actual intent to defraud or with reckless disregard for the truth. *See Crumley,* 428 B.R at 366-67. A debtor's failure to correct inconsistent statements and omissions

27

when he or she files amended schedules, coupled with the existence of more than one falsehood in them, may give rise to a reckless indifference to the truth. *See Beaubouef,* 966 F.2d at 178. However, a court should not deny a discharge when items are omitted from schedules by honest mistake. *Id*. A particular pattern of mistakes is far more important than their number. *Crumley*, 428 B.R. at 367.

93.     In this case, the Court observed the Debtors during a live, in person, trial and heard them testify. The Debtors' testimony was credible. The Court is satisfied that they possessed no actual intent to defraud, delay or hinder creditors.

94.     Similarly, the Court concludes that the Debtors' discharge should not be denied based on a reckless indifference to the truth. This is not a case where the Debtors filed several sets of amended schedules with persistent falsehoods. Rather, the overwhelming majority of false statements and improper disclosures in the Debtors' bankruptcy case relate to HMG and the HMG Account. The Court did not rule that the Debtors had an equitable interest in the HMG Account until its Summary Judgment Ruling several months before trial. And the Court now holds the Debtors' maintain an equitable interest in HMG. While the Debtors' should have disclosed these assets, the evidence shows that the Debtors operated under an honest but mistaken belief they did not need to be disclosed.

95.     Without the pattern of mistakes related to HMG and the HMG Account, CHP has only proved up several other mistakes on the Schedules and SOFA. The Court concludes that the remainder of these mistakes do not rise to the level of a reckless disregard for the truth in this case.

96.     **In Addition, the Debtors Reasonably Relied on the Advice of Counsel in Good Faith.**

A debtor may use the advice of counsel to defeat a claim under section 727(a)(4) if the debtor's reliance was "reasonable and in good faith." *Gebhardt*, 326 B.R. at 374. Reliance is only available

if the advice was required for debtors to understand what they needed to disclose. *Neary v. Peres (In re Peres)*, 2007 Bankr. LEXIS 3124, at *26 (Bankr. N.D. Tex., Sep. 18, 2007).

97.     In this case, the Court concludes that the Debtors' reliance on Mr. Moore's advice was reasonable. Mr. Moore is an experienced and respected bankruptcy attorney in Dallas, Texas. Mr. Moore credibly testified that the Debtors initially discussed disclosing HMG on the Schedules, but Mr. Moore advised that disclosure was not necessary. While Mr. Schwyhart is an experienced businessman, the Debtors' have been involved in numerous entities and multiple sets of litigation over time. Their financial affairs are complex. And they often seem to rely on the advice of other professionals in their business and personal financial affairs. This does not appear to be a situation where the Debtors took certain actions and later claimed they blindly relied on counsel. *See, e.g.*, *Gebhart*, 326 B.R. at 374; *see also In re Peres*, 2007 Bankr. LEXIS 3124, at *28. Rather, it appears to this Court that time, effort, and deliberation took place in preparing the Schedules and SOFA. While debtors have "a duty to carefully examine the schedules and to be very sure that all information listed is completely correct," the Court believes the Debtors endeavored to accomplish that in this case. *Roberts v. McVay (In re Roberts)*, 2010 U.S. Dist. LEXIS 5690, at *14 (S.D. Tex. Jan. 25, 2010).

98.     The Court also believes the Debtors acted in good faith. They did not sign their Schedules and SOFA under oath without reading them. Instead, the Debtors credibly testified that they spent substantial time preparing these documents. *See In re Peres*, 2007 Bankr. LEXIS 3124, at *28. And throughout the entire bankruptcy process, the Debtors were forthcoming in producing documents to parties in interest.

99.     Because CHP has failed to meet its burden on fraudulent intent, its claims under section 727(a)(4)(A) fail.

### III.    CONCLUSION

No matter how thin you pour a pancake there are always two sides. In its Complaint, CHP essentially argues that the Debtors undertook a very sophisticated, multi-year plan to defraud and hide assets from creditors and the Court. CHP also alleges that many of the Debtors' entities are really the *alter egos* of the Debtors, including Pinnacle Villa, which now owns the Debtors' former home. But this trial came down to burden of proof, and CHP did not prove up this alleged scheme at trial. CHP instead appeared to rely on reckless disregard by targeting several of the Debtors' mistakes on their Schedules or SOFA without true appreciation for context.

At trial, the Debtors appeared to be honest people. They made a number of mistakes, but they seemed honest. And the Debtors' mistakes will not materially alter the outcome for creditors in this bankruptcy case. The Debtors are involved in numerous entities and appear to rely on the advice of other professionals in their personal and business financial affairs. The Court believes the Debtors endeavored to cooperate with parties in interest in their bankruptcy case. They produced all financial records in their possession, answered questions on numerous occasions under oath, and tried in good faith to explain the inconsistencies in their disclosures.

A global denial of a debtor's discharge is a harsh remedy; it is, in essence, a civil death penalty. The Debtors do not appear to be the kind of people who would jeopardize a discharge of over $82 million in debt over the limited, improper disclosures in this case. Ultimately, the Court finds and concludes that CHP has failed to meet its burden and the Debtors are entitled to their discharge.